JONATHAN ANTHONY LEE TORRES,      )
                                  )
                    Plaintiff,    )
                                  )        **MEMORANDUM OF**
vs.                               )        **DECISION AND ORDER**
                                  )
ERIC DYE, et al.,                 )
                                  )
                    Defendants.   )
_____   )

**THIS MATTER** is before the Court on the Defendants' Motion for Summary Judgment [Doc. 104], and Motion to Seal [Doc. 107].

## I. BACKGROUND

The Plaintiff, Jonathan Anthony Lee Torres, filed this action pursuant to 42 U.S.C. § 1983 addressing incidents that allegedly occurred while he was incarcerated at the Alexander Correctional Institution ("AXCI").[1] The Plaintiff's Second Amended Complaint[2] passed initial review against Defendants Chris Biecker, Daniel Brown, David Carroll, Russell Chester, Jeffrey Clawson, Travis Delozier, Eric Dye, Justin Franks, Troy Morrison, Charles Moss, Kenneth Poteat, and Daniel Turner for retaliation; against Moss for violating due process; against Biecker, Chester, and Dye for supervisory liability; and the Court exercised supplemental jurisdiction over Plaintiff's North Carolina claims for negligence and for violating N.C. Constitution Article I, Section 19.[3]

---

[1] The Plaintiff is no longer incarcerated.

[2] The Complaint is verified, but the Amended Complaint and the Second Amended Complaint are unverified. [See Docs 1, 17, 54].

[3] Plaintiff sues the Defendants in their individual and official capacities, stating that "[o]fficial capacity is to advance state claims and negligence tort upon supplemental jurisdiction." [Doc. 54: Second Am. Compl. at 2-3, 12-15].

[Docs. 53: Order on Initial Review; Doc. 54: Second Am. Compl.]. The Plaintiff seeks: a declaratory judgment; injunctive relief; nominal, compensatory, and punitive damages; costs and fees; and any other relief the Court deems just and proper. [Doc. 54: Second Am. Compl. at 5].

After the deadline for filing dispositive motions expired, the parties participated in a judicial settlement conference which resulted in an impasse. The case was then reassigned to the undersigned. A jury trial is scheduled for the Court's March 2025 term. [Doc. 101: Notice of Hearing]. On September 19, 2024, this Court entered a Pretrial Order and Case Management Plan in which it granted the parties the opportunity to file dispositive motions. [Doc. 102: Pretrial Order at 4]. The deadline to do so expired on October 22, 2024. [Id.; Oct. 16, 2024 Text-Only Order].

The Defendants timely filed a Motion for Summary Judgment [Doc. 104: MSJ], a supporting Memorandum [Doc. 105: MSJ Memo], and Exhibits, some of which they have moved to seal [Docs. 105-1 through 105-12 and 110: MSJ Exhibits; Doc. 110: Doc. 106: Sealed Exhibit 1; Doc. 107: Motion to Seal]. The Court entered an Order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for responding to the summary judgment motion and of the manner in which evidence may be submitted to the Court. [Doc. 109: Roseboro Order]. The Plaintiff has not responded to the Motion for Summary Judgment or to the Motion to Seal, and the time to do so has expired.[4] These matters are ripe for disposition.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a

---

[4] The Court will consider the relevant portions of the record, including the Plaintiff's verified Complaint, in its summary judgment analysis. See Goodman v. Diggs, 986 F.3d 493, 498-99 (4th Cir. 2021) (holding that a district court is to consider verified prisoner complaints as affidavits on summary judgment "when the allegations contained therein are based on personal knowledge").

2

verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Namely, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. To that end, only evidence admissible at trial may be considered by the Court on summary judgment. Kennedy v. Joy Technologies, Inc., 269 F. App'x 302, 308 (4th Cir. 2008) (citation omitted).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). As the Supreme Court has emphasized,

3

> "[w]hen the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts …. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-28, 106 S. Ct. 2505 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

Scott, 550 U.S. at 380.

## III. FACTUAL BACKGROUND

The forecast of evidence, viewed in the light most favorable to the Plaintiff as the non-moving party, shows the following.

The Plaintiff was transferred to AXCI on December 6, 2019. [See Doc. 106: MSJ Ex at 17 (Offender External Movements); Doc. 1: Compl. at 5]. He had no problems until he was assigned to the Green Unit for a kitchen job in mid-March 2020. [Doc. 1: Compl. at 5, 32].

On March 29, 2020, Officer Carroll (Green Unit) noticed the Plaintiff wearing a work apron that displayed a possible gang symbol.[5] [Doc. 105-2: Carroll Decl. at ¶ 3; Doc. 106: MSJ Ex at 39 (Exhibit E, apron photo); see Doc. 105-1: MSJ Ex. at 15 (Exhibit F, Police Magazine article describing Sureno gang symbols); Doc. 1: Compl. at 5]. Carroll searched the Plaintiff and discovered a note using possible gang language, "the Homies." [Id.; Doc. 1: Compl. at 5, 26; Doc. 106: MSJ Ex at 41 (Exhibit E, note)]. Carroll confiscated the items and reported them to his

---

[5] The Defendants describe the symbol – two lines topped by three dots – as a gang-related three-pointed crown, whereas the Plaintiff describes it as a symbol for the number "13" in Mexican culture.

4

superiors and to Security Risk Group ("SRG")[6] staff, *i.e.,* Captain Chester and Officers Turner and Morrison, who work as a team. [Doc. 105-2: Carroll Decl. at ¶ 3; Doc. 1-5-3: Turner Decl. at ¶ 4]. Carroll[7] then "ransacked" Plaintiff's cell and confiscated a drawing and photographs as possible SRG material. [Doc. 1: Compl. at 26; see Doc. 106: MSJ Ex. at 55-56 (Exhibit G, notes)].

On March 31, 2020, the Plaintiff filed a grievance about the March 29 incidents. [Doc. 1: Compl. at 4, 26; Doc. 1-1 at 1 (Grievance No. 4870-2020-LPODA-12960)]. The Green Unit Manager[8] rejected the grievance on April 7, 2020 pursuant to the North Carolina Department of Public Safety ("NCDPS")[9] Administrative Remedy Procedure ("APR") .0306 because it "[a]ppeals [a] disciplinary action." [Id.; id.; Doc. 105-1: MSJ Ex at 42 (ARP)].

On the morning of April 2, 2020, Carroll escorted the Plaintiff to the SRG office for a meeting with Chester, Turner, and Morrison. [Id. at 27-28]. They questioned the Plaintiff about the confiscated items, his gang involvement, and the identity of individuals who had drugs in the "yard." [Id.]. The Plaintiff denied gang involvement or any relevant knowledge, and referred to himself as a "POW." [Id.]. Chester said that "life would be hell and bad accidents can happen," and that Plaintiff would be locked up for a FIO investigation for being a "smart a**." [Id.].

On the afternoon of April 2, 2020, Turner determined that the apron and note seized from Plaintiff were gang-related based on his training and experience, and Plaintiff was charged with an A-14 disciplinary infraction (involvement with SRG). [Doc. 105-3: Turner Decl. at ¶¶ 3, 6; see Doc. 106: MSJ Ex. at 24 (Exhibit E, Investigating Officer's Report)]. On April 6, 2020, Turner

---

[6] Also known as Facility Intelligence Team/ Field Intelligence Officers ("FIO"). [Doc. 105-5: Brown Decl. at ¶ 3].

[7] Officer Hansley, who is not a defendant in this case, participated in the cell search.

[8] Elizabeth Powell, who had a secret personal relationship with Officer Carroll, is not presently a defendant in this case. [See Doc. 33: Order; Doc. 54: Second Am. Compl.].

[9] NCDPS was renamed the North Carolina Department of Adult Corrections ("NCDAC"); the terms are used interchangeably.

completed his investigation of the items seized from Plaintiff's cell. [Doc. 105-3: Turner Decl. at ¶ 7]. He concluded that they included gang-related symbols and discussions of gang-related business, and Plaintiff received another A-14 charge. [Id.].

On April 7, 2020, disciplinary hearing officer ("DHO") Patricia Blackburn[10] found the Plaintiff guilty with regards to the apron and note, and the Plaintiff pleaded guilty with regards to the items from his cell. [Doc. 105-3: Turner Decl. at ¶ 7; Doc. 106: MSJ Ex at 30, 47; Doc. 1: Compl. at 28-29]. He received sanctions including 10 days in segregation for each offense. [Id.].

SRG staff received information around that same that the Plaintiff was planning to introduce contraband into the prison with help from his mother, Sandy Torres.[11] [Doc. 105-3: Turner Decl. at ¶ 8; Doc. 105-6: Dye Decl. at ¶ 7]. The Plaintiff was placed in restrictive housing while the matter was investigated.[12] [Doc. 105-3: Turner Decl. at ¶ 9]. On April 18, 2020, Sergeant Clawson released Plaintiff from segregation because he needed the cell. [Doc. 1: Compl. at 29].

On April 20, 2020, SRG staff learned that the Plaintiff had been released from segregation. [Doc. 1: Compl. at 29]. Unit Manager Poteat (Red Unit) instructed Sergeant Moss to return the Plaintiff to segregation pending an investigation. [Id. at 21-22, 29; Doc. 105-3 at ¶ 9]. Moss placed the Plaintiff in a recreation cage. The Plaintiff demanded to know why he was being locked up and requested the officer in charge ("OIC"). [Doc. 1: Compl. at 30]. OIC Brown told Plaintiff that he did not know why Plaintiff was being locked up because information about ongoing investigations is not disclosed to staff. [Id.; Doc. 105-5: Brown Decl. at ¶ 4]. Brown spoke to the Plaintiff again

---

[10] Blackburn is not presently a defendant in this action.

[11] SRG staff received information that the Plaintiff had directed his mother to purchase liquid K2 (synthetic marijuana) and mail it to another individual who was going to spray onto documents to be mailed into the prison. [Doc. 105-3: Turner at ¶ 8]. SRG also received information that Plaintiff had directed another individual to purchase roach spray in an attempt to smuggle it as an intoxicant into the prison. [Id.].

[12] As noted *supra*, the Plaintiff had also received segregation for his A-14 violations. [Doc. 1: Compl. at 29-30].

after lunch because his behavior was increasingly disruptive. [Id.; id. at ¶ 5]. Brown determined that Plaintiff's behavior warranted property removal; Plaintiff responded to this news with hostility and threats. [Doc. 105-5: Brown Decl. at ¶ 6]. Brown and Poteat ordered, in Dye's presence, that the Plaintiff be placed in full restraints. [Id. at ¶ 9; id. at 30-31; see Doc. 105-1: MSJ Ex (Exhibit AK, Use of Force Policy .1504(i)(1) (discussing restraints for behavioral management))]. The Plaintiff refused to cuff up, so Brown told Plaintiff that a team would extract him from the cage if necessary. [Id. at ¶ 6; id. at 30]. The Plaintiff responded aggressively, which "riled up" the wing. [Doc. 105-5: Brown Decl. at ¶ 6]. Brown ordered a sergeant[13] to retrieve a handheld camera as a team prepared for extraction. [Id. at ¶¶ 7-9]. Associate Warden Dye came to talk to the Plaintiff, who finally submitted to cuffs. [Id. at ¶ 8; Doc. 1: Compl. at 30]. The Plaintiff remained in full restraints for six hours.[14] [Doc. 1: Compl. at 31]. Poteat and Brown reported the Plaintiff's misconduct that same day. [See Doc. 106: MSJ Ex at 60, 65]. Poteat and Brown do not recall being aware, on April 20, 2020, that Plaintiff had filed grievances. [Doc. 105-4: Poteat Decl. at ¶ 6; Doc. 105-5: Brown Decl. at ¶ 12]. Such knowledge would not have changed their conduct, including the decisions to report his disciplinary infractions and to use full restraints. [Id.; id.].

On April 21, 2020, the Plaintiff filed a "report"[15] with two sergeants[16] that "SRG" had threatened him on April 2. [Doc. 1: Compl. at 24, 31].

On April 22, 2020, Officer Morrison completed the contraband smuggling investigation. [Doc. 105-8: Morrison Decl. at ¶ 10; see Doc. 106: MSJ Ex. at 78-94 (Exhibit K, investigative

---

[13] Sergeant Darren Daves is not a defendant in this case.

[14] The full restraint step-down procedure usually lasts eight hours; Plaintiff was released two hours early. [Doc. 105-5: Brown Decl. at ¶ 9].

[15] It is unclear whether this report was verbal or written. A written statement by Plaintiff addressing these matters is dated April 22, 2020. [See, e.g., Doc. 106: MSJ Ex at 104 (Ex L Statement by Witness)].

[16] This refers to Sergeant Goon and another unnamed sergeant, who are not defendants. [Doc. 1: Compl. at 31].

records)]. He concluded that the Plaintiff had attempted to introduce contraband into the facility through his mother; he notified AXCI staff of his findings. [Id.].

On April 23, 2020, the Plaintiff filed a grievance addressing the incidents of April 2 and 20. [Doc. 1: Compl. at 24; see Doc. 106: MSJ Ex at 161 (Exhibit S, Grievance No. 4870-2020-LPODA-13144)]. Unit Manager Biecker (Red Unit) completed the Step One response on May 4, 2020, finding that an investigation revealed no evidence to support Plaintiff's allegations. [Doc. 105-12: Biecker Decl. at ¶ 15]. Dye agreed at Step Two on May 5, 2020. [Doc. 105-6: Dye Decl. at ¶ 5]. The Step Three reviewer agreed and dismissed the grievance. [Doc. 106: MSJ Ex at 160 (Ex S, Step Three response)].

On April 24, 2020, Officer Morrison completed an investigation into information from a confidential source ("CS") about Plaintiff's participation in the Mexican Mafia. [Doc. 1-1: Plaintiff's Ex at 16, 18 (April 28, 2020 Disciplinary Report; April 28, 2020 Record of Hearing)]. Plaintiff was charged with an A-14 charge. [Id.]. On April 28, 2020, the DHO found the Plaintiff guilty and imposed sanctions including segregation and the loss of time credit. [Id.]. On June 11, 2020, the Plaintiff's appeal was denied. [Doc. 1-1 at: Compl. Ex at 19 (June 11, 2020 Letter)].

April 30, 2020, Officer Morrison completed an investigation into a note found in another inmate's cell, from the Plaintiff to another inmate, regarding an attempt to introduce intoxicants into the prison on greeting cards. [Doc. 1-1: Plaintiff's Ex at 39 (Disciplinary Report)]. On May 1, 2020, the Plaintiff was charged with A-99 (attempt) and A-12 (introduce contraband) infractions, however, the charges were dismissed on May 12, 2020. [Doc. 11-3: Plaintiff's Ex at 12 (May 12, 2020 Disciplinary Report)].

On May 8, 2020, the Plaintiff was charged with B-18 (threaten staff) and B-25 (disobey orders) infractions for the incidents on the morning of April 20 (1159 hours); and with B-18 and

B-24 (profanity) infractions for the incidents after lunch that day (1425 hours). [Doc. 105-4: Poteat Decl. at ¶ 3; Doc. 105-5: Brown Decl. at ¶ 10; see Doc. 106 at 57, 67 (Exhibits H and I, disciplinary materials)]. Officer Moss investigated both sets of infractions. [Id.]. Moss obtained surveillance video footage for the 1159 and 1425 incidents at Plaintiff's request. [Doc. 105-7: Moss Decl. at ¶¶ 4-5]. Moss also sought footage from the handheld camera at Plaintiff's request, but it could not be found at that time. [Id. at ¶ 6]. The charges were sent back for reinvestigation due to missing video. [Doc. 1: Compl. at 35-36]. At a hearing on May 29, 2020, the DHO found Plaintiff guilty of both sets of infractions. [Doc. 106: MSJ Ex at 57, 67]. He was sanctioned with: segregation (20 days for the 1159 offenses and 30 days for the 1425 offenses), extra duty, and loss of privileges. [Id. at 57, 72]. He did not lose any "days cred time." [Id.]. Plaintiff's appeals were rejected as untimely. [Doc. 1-1: Plaintiff's Ex at 35-37; Doc. 1: Compl. at 37; see Doc. 105-1: MSJ Ex at 29 (Exhibit M, Offender Disciplinary Procedure .0205(b)(6))].

On May 4, 2020, the Plaintiff filed a grievance in order to "document violation of [his] due process rights of law, of disciplinary proceedings done by [DHO Blackburn]" and requesting to "have [his] write-ups pre-paired like there supposed to…." [Doc. 11-3: Plaintiff's Ex at 7-8] (errors uncorrected). He also alleged that SRG and other staff have been making false allegations in order to put him in segregation and to assert false disciplinary charges against him "for retaliation b/c [Plaintiff] wouldn't tell any information" on April 2. [Id.] (errors uncorrected). On May 7, the grievance was rejected by Biecker because it "[a]ppeals disciplinary action." [Id. at 9]. This rejection was "per Superintendent Dye." [Doc. 1: Compl. at 24]

On May 12, 2020, the Plaintiff was charged with A-99 and A-12 infractions based on Morrison's contraband smuggling investigation involving Sandy. [Doc. 105-6: Dye Decl. at ¶ 7; Doc. 106: MSJ Ex at 95 (Exhibit L, April 22, 2020 offenses)]. The DHO dismissed the disciplinary

charges on May 11, 2020 "due to timeframe." [Doc. 1: Compl. at 32; Doc. 106: MSJ Ex at 97 (May 12, 2020 Record of Hearing)]. Dye also permanently revoked Sandy's visitation privileges based on evidence that she was involved in Plaintiff's smuggling plan, pursuant to policy, to prevent the introduction of contraband into the prison. [Doc. 1: Compl. at 32; Doc. 105-6: Dye Decl. at ¶¶ 7-9; Doc. 105-1: MSJ Ex (Exhibit AL, Visitation Policy/Procedure)]. Sandy was notified of the revocation in writing and had the opportunity to appeal. [See Doc. 11-3: Plaintiff's Ex at 4 (April 22, 2020 Letter)]. The revocation prevented Sandy from sending Plaintiff money, which he had been using to purchase litigation materials. [Doc. 1: Compl. at 32-33].

On May 14, 2020, the Plaintiff turned in a grievance to Officer Delozier (Red Unit), challenging Dye's revocation of Sandy's visitor status, and claiming that Morrison retaliated against him for complaining about "SRG and staff." [Doc. 1-1: Plaintiff's Ex at 9; Doc. 1: Compl. at 22]. Delozier said that he placed the grievance in Poteat's office, however, it disappeared. [Id. at 25, 34]. On May 30, 2020, the Plaintiff turned in a grievance to Officer Franks (Red Unit), reiterating the May 14 complaints and noting his failed filing with Delozier. [Id. at 22, 25; Doc. 1-1: Plaintiff's Ex at 10]. Franks gave the grievance to Sergeant Clawson who said it would be processed but Plaintiff received no response. [Doc. 1: Compl. at 25, 33].

On June 4, 2020, the Plaintiff was transferred to the Rehabilitative Diversion Unit ("RDU") at the Marion CI. [Id.; Doc. 106: MSJ Ex at 17 (Offender External Movements)].

On March 31, 2021, the Plaintiff filed a grievance alleging that the smuggling charges were "fabricated … for the purpose of taking [Sandy] off visitation," in retaliation for Plaintiff's complaints about SRG. [Doc. 106: MSJ Ex at 222 (Exhibit AC, Grievance No. 3730-2021-FU1N-15232)]. The grievance was dismissed. [Id. at 221-24 (Step One, Two, and Three Responses)].

The Defendants state that: they did not retaliate against the Plaintiff; they had no feelings

of ill-will or a desire to harm the Plaintiff; and they were merely performing their duties with respect to these incidents. [Doc. 105-2: Carroll Decl. at ¶ 7; Doc. 105-3: Turner Decl. at ¶ 13; Doc. 105-4: Poteat Decl. at ¶ 7; Doc. 105-5: Brown Decl. at ¶ 13; Doc. 105-6: Dye Decl. at ¶ 10; Doc. 105-7: Moss Decl. at ¶ 8; Doc. 105-8: Morrison Decl. at ¶ 13; Doc. 105-9: Chester Decl. at ¶ 14; Doc. 105-10: Franks Decl. at ¶ 5; Doc. 105-11: Clawson Decl. at ¶ 5; Doc. 105-12: Biecker Decl. at ¶ 6; Doc. 110: Delozier Decl. at ¶ 5].

The Plaintiff fully exhausted 21 grievances between June 1, 2019 and his filing of this action in 2022, of which two (4870-2020-LPODA-1344 and 3730-2021-FU1N-16232) are relevant to his present claims. [See Doc. 106: MSJ Ex at 141 (Inmate Grievance Resolution Board Memo.); see also Doc. 106: MSJ Ex at 142-261 (Exhibits P through AJ)]. Delozier, Franks, Clawson, Biecker, and Dye never intentionally mishandled Plaintiff's grievances, and they are not aware of others doing so. [Doc. 110: Delozier Decl. at ¶ 3; Doc. 105-10: Franks Decl. at ¶ 3; Doc. 105-11: Clawson Decl. at ¶ 3; Doc. 105-12: Biecker Decl. at ¶ 3; Doc. 105-6: Dye Decl. at ¶ 3].

The Defendants have filed handheld video footage from April 20, 2020[17] which depicts the following events:

| Video 00321: | Plaintiff, in a recreation cage, converses with Brown |
| Video 00322: | Plaintiff continues conversing with Brown, tightens his pants, shakes out his arms and legs |
| Video 0323: | Plaintiff continues conversing with Brown |
| | 00:10   Plaintiff tightens his pants, paces |
| | 00:36   Plaintiff uses profanity |
| | 2:20   Conversation with Brown ends; Plaintiff paces, stretches his arms |

---

[17] The Defendants have not filed surveillance video from April 20 because such was produced to the DHO; only the handheld video is addressed in the Plaintiff's present disciplinary due process claim. [Doc. 105: MSJ Memo. at 24].

| | | |
|---|---|---|
| | 2:36 | Distant shouting, including profanity |
| | 3:08 | Plaintiff hits his hand with his fist |
| | 4:13 | Plaintiff paces, stretches, tightens his pants |
| | 6:14 | Plaintiff rolls up his pant cuffs |
| | 6:26 | Plaintiff does pull-ups from the cage ceiling |
| | 7:30 | Distant shouting, including profanity |
| | 19:19 | Plaintiff paces, pulls up his pant legs |
| | 19:32 | Plaintiff gestures and addresses someone off-camera repeatedly |
| | 26:25 | Plaintiff uses profanity |
| | 28:15 | Plaintiff explains why he would not listen to Poteat, using profanity |
| Video 324: | | Plaintiff paces, uses profanity, stretches |

[See Doc. 105-1, Oct. 30, 2024 Manually Filed Flash Drive (MSJ Ex. J)].[18]

## IV.    DISCUSSION

### A.  Section 1983 Claims

#### a.  Official Capacity Claims

It does not appear that the Plaintiff is attempting to assert § 1983 claims against the Defendants in their official capacities.  [See Doc. 54: Second Am. Compl. at 15]. Any such claims are subject to dismissal. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."  Will v. Dep't of State Police, 491 U.S. 58, 71 (1989).  Because a state is not a "person" under § 1983, state officials acting in their official capacities cannot be sued for damages thereunder.  Allen v. Cooper, No. 1:19-cv-794,

---

[18] The videos are not timestamped. Progress times are included for reference.

12

2019 WL 6255220, at *2 (M.D.N.C. Nov. 22, 2019). Furthermore, the Eleventh Amendment bars suits for monetary damages against the State of North Carolina and its various agencies. See Ballenger v. Owens, 352 F.3d 842, 844-45 (4th Cir. 2003). As such, any § 1983 claims against the Defendants in their official capacities for damages are not cognizable under § 1983 and are barred by sovereign immunity. Moreover, any § 1983 claims against the Defendants for declaratory and injunctive relief are moot because the Plaintiff is no longer incarcerated. See Incumaa v. Ozmint, 507 F.3d 281, 286-87 (4th Cir. 2007) ("the transfer of an inmate from a unit or location where he is subject to [a] challenged policy, practice, or condition, to a different unit or location where he is no longer subject to the challenged policy, practice, or condition moots his claims for injunctive and declaratory relief").

Accordingly, the Defendants will be granted summary judgment to the extent that the Plaintiff has asserted § 1983 claims against them in their official capacities.

### b. Exhaustion

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust his administrative remedies before filing a § 1983 action. 42 U.S.C. § 1997e(a). The PLRA provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id. In Porter v. Nussle, the Supreme Court held that the PLRA's exhaustion requirement applies to all inmate suits about prison life. 534 U.S. 516, 532 (2002). The Court ruled that "exhaustion in cases covered by § 1997e(a) is now mandatory." Id. at 524 (citation omitted). The Porter Court stressed that, under the PLRA, exhaustion must take place before the commencement of the civil action to further the efficient administration of justice. Id.

In Woodford v. Ngo, the Supreme Court held that the PLRA exhaustion requirement requires "proper" exhaustion: "Administrative law ... requir[es] proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" 548 U.S. 81, 90 (2006) (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)). Further, "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Jones v. Bock, 549 U.S. 199, 211 (2007) (citing Porter, 534 U.S. at 524). Because exhaustion of administrative remedies is an affirmative defense, defendants have the burden of pleading and proving lack of exhaustion. Id. at 216.

NCDAC has established a three-step procedure governing submission and review of inmate grievances in its ARP. Moore v. Bennette, 517 F.3d 717, 721 (4th Cir. 2008). Inmates are required to "properly" exhaust administrative remedies in accordance with ARP. Woodford, 548 U.S. at 90; Moore, 517 F.3d at 726. An inmate does not exhaust his administrative remedies until he completes all three steps of the ARP. Moore, 517 F.3d at 726.

A prison official has the burden to prove an inmate's failure to exhaust available administrative remedies. Jones, 549 U.S. at 216. Once a defendant presents evidence of a failure to exhaust, the burden of proof shifts to the inmate to show, by a preponderance of the evidence, either that exhaustion occurred or that administrative remedies were unavailable. Graham v. Gentry, 413 F. App'x 660, 663 (4th Cir. 2011).

The Defendants have forecast evidence that the Plaintiff failed to exhaust the ARP with regards to the claims that the Defendants retaliated against him by mishandling several grievances. For instance, the Plaintiff availed himself of the ARP by fully exhausting 21 grievances between June 1, 2019 and May 2022, including Grievance No. -13144 in which Plaintiff addressed the

14

events of April 20, 2020, and Grievance No. -15232 in which he addressed his mother's removal from visitation and complaining about SRG. However, the exhausted grievances do not address prison officials' alleged mishandling of other grievances. [See Doc. 106: MSJ Ex at 161 (Exhibit S, Grievance No. 4870-2020-LPODA), at 222 (Exhibit AC, Grievance No. 3730-2021-FU1N-15232)]. Nor has the Plaintiff demonstrated that the ARP was unavailable to him. [See, e.g., Doc. 106: MSJ Ex at 142261 (exhausted grievances)]. Accordingly, the Defendants' Motion for Summary Judgment will be granted on the Plaintiff's claims that the Defendants retaliated by mishandling his grievances.[19]

### c. Retaliation

An inmate has a clearly established First Amendment right to be free from retaliation for filing lawsuits. See Booker v. S.C. Dep't of Corrs., 855 F.3d 533, 540 (4th Cir. 2017); Thompson v. Commonwealth of Va., 878 F.3d 89, 110 (4th Cir. 2017). Inmates also have a protected First Amendment right to complain to prison officials about prison conditions and improper treatment by prison employees. See Patton v. Kimble, 717 Fed. App'x 271, 272 (4th Cir. 2018).

A retaliation claim requires proof that (1) the plaintiff engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct. Martin v. Duffy, 977 F.3d 294, 299 (4th Cir. 2020). Retaliation claims brought by prisoners, however, are treated with skepticism because every act of discipline by a prison official is retaliatory in that it responds directly to prisoner misconduct. See Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994). More, bare or conclusory assertions of retaliation are insufficient

---

[19] Dismissal for failure to exhaust administrative remedies is ordinarily without prejudice. However, the Plaintiff has also failed to establish the existence of a genuine dispute of material fact regarding the merit of these claims as discussed in Section c(iv), *infra*. The dismissal will, therefore, be with prejudice.

15

to establish a retaliation claim. Id., 40 F.3d at 74.

### i. Disciplinary Charges

The Plaintiff alleges that bogus disciplinary charges were asserted against him on April 2, 6, 22, 24, and 30, 2020, in retaliation for his complaints about staff. [See Doc. 54: Second Am. Compl. at 23-26, 29, 32-33]. The Defendants have forecast evidence that they had no retaliatory motive against the Plaintiff and that the disciplinary charges were supported by evidence that the Plaintiff was involved in gang-related activities including attempted drug smuggling. [See, e.g., Doc. 105-2: Carroll Decl. at ¶¶ 3-5; Doc. 105-3: Turner Decl. at ¶¶ 7-8]. The Plaintiff's conclusory allegations of retaliation, his disagreement with the merits of the disciplinary charges, and his reliance on the temporal proximity between the disciplinary charges and his ongoing complaints about staff, fail to demonstrate that a genuine dispute of material fact exists that Defendants retaliated against him. [See Doc. 1: Compl. at 26, 31-33, 36-37]. Moreover, the Court need not accept the Plaintiff's self-serving denial that he was involved in SRG activity because such is contradicted by his April 7, 2020 guilty plea guilty plea to an A-14 infraction. [See Doc. 106 at 47 (Exhibit G, Waiver of Hearing)]; Scott, 550 U.S. at 380. The Plaintiff has, therefore, failed to demonstrate the existence of a genuine dispute of material fact that these disciplinary charges were retaliatory.

### ii. Full restraints

The Plaintiff alleges that he was placed in full restraints for six hours on April 20, 2020 in retaliation for his past conduct. [Doc. 54: Second Am. Compl. at 32-34]. The Defendants have forecast evidence – including video footage – that the Plaintiff's actions included aggressive, oppositional, disruptive, and threatening behavior that justified the use of full restraints pursuant to prison policy, to obtain Plaintiff's compliance and to restore order. [See Doc. 105-5: Brown

Decl. at ¶¶ 9-11; Doc. 105-1: MSJ Ex at 53 (Use of Force Policy)]. Moreover, Defendants Brown and Poteat have forecast evidence that they were unaware on April 20, 2020 that the Plaintiff had made grievances about staff and, if they had known, that they would have made the same decisions in response to Plaintiff's behavior. [See Doc. 104-5: Poteat Decl. at ¶¶ 6-7; Doc. 105-5: Brown Decl. at ¶¶ 12-13]. The Court need not accept Plaintiff's conclusory statement that restraints were "intended to be punishment for past conduct – for wanting information [and] [n]ot to ensure safety" because such is refuted by video of his oppositional behavior as well as his admission that he refused to comply with officers' orders. [See Doc. 1: Compl. at 30-32]; see Scott, 550 U.S. at 380. The Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact that the use of full restraints on April 20 was retaliatory.

### iii. Segregation

The Plaintiff alleges that he was placed in segregation in retaliation for complaining about staff, and for refusing to provide SRG staff with information. [Doc. 54: Second Am. Compl. at 28-30]. The forecast evidence demonstrates that the Plaintiff was placed in segregation on April 2 and 20, 2020 due to ongoing investigations. [See, e.g., Doc. 105-3: Turner Decl. at ¶ 9; Doc. 105-5: Brown Decl. at ¶ 3; Doc. 105-9: Chester Decl. at ¶¶ 9-10]. The Defendants have also forecast evidence that Defendants Carroll, Chester, Morrison, and Turner were unaware of the Plaintiff's grievances when they made decisions that resulted in his segregation, and that knowledge of the same would not have affected their decisions. [See Doc. 105-2: Carroll Decl. at ¶¶ 3-7; Doc. 105-8: Morrison Decl. at ¶¶ 11-13; Doc. 105-9: Chester Decl. at ¶¶ 9-10, 13-14; Doc. 105-5: Brown Decl. at ¶¶ 3, 12-13; Doc. 105-3: Turner Decl. at ¶¶ 9-13]. The Plaintiff's conclusory contentions that the segregation was retaliatory, his disagreement with officials' decisions that segregation was warranted, and the temporal proximity between the periods in segregation and the Plaintiff's

ongoing complaints about staff fail to demonstrate the existence of a genuine dispute of material fact that the segregation was retaliatory. See Adams, 40 F.3d at 74.

### iv. Mishandled grievances

The Plaintiff alleges that the Defendants mishandled grievances on April 21 and 23, and May 4, 14, and 30, 2020 in retaliation for his complaints about staff. [Doc. 54: Second Am. Compl. at 5-8, 24-26, 32, 36]. The forecast of evidence demonstrates that Plaintiff's grievances were rejected or denied pursuant to policy, and that any instances of mishandling were isolated and unintentional. [See, e.g., Doc. 105-6: Dye Decl. at ¶¶ 3-5; Doc. 105-12: Biecker Decl. at ¶¶ 3-6; Doc. 105-11: Clawson Decl. at ¶¶ 3-5; Doc. 110: Delozier Decl. at ¶¶ 3-5; Doc. 105-10: Franks Decl. at ¶¶ 3-5]. Plaintiff's disagreement with the denial or rejection of his grievances; the temporal proximity between Plaintiff's complaints about staff and the alleged mishandling of grievances on; and his conclusory contention that the same was retaliatory fail to demonstrate the existence of a genuine dispute of material fact regarding retaliation. See Adams, 40 F.3d at 74; Wagner v. Wheeler, 13 F.3d 86, 91 (4th Cir. 1993) (generally, the mere temporal proximity between a protected activity and an allegedly retaliatory action "is simply too slender a reed on which to rest a Section 1983 retaliation claim."); see, e.g., Locke v. Solomon, No. 3:17-cv-337-FDW, 2018 WL 1950444 (W.D.N.C. April 25, 2018) (granting judgment on the pleadings on a retaliation claim where the defendant merely followed through on his pre-grievance decision to recommend an STG classification, after a grievance was filed).

### v. Visitation

The Plaintiff alleges that Defendant Dye retaliated against him by permanently removing Sandy from the approved visitor list based on fabricated evidence of contraband smuggling. [Doc. 54: Second Am. Compl. at 23]. The forecast of evidence reflects that: an investigation revealed

18

evidence that Sandy planned to help Plaintiff smuggle contraband into the prison; Sandy's visitation privileges were revoked to prevent the introduction of contraband into the facility, pursuant to policy; and the visitation decision was not dependent on Plaintiff's disciplinary infractions. [Doc. 105-6: Dye Decl. at ¶¶ 7-9]. Plaintiff's conclusory assertions that these actions were retaliatory; his disagreement with the allegations' merit; his belief that visitation should have been restored when his disciplinary charges were dismissed; and the collateral consequence that Sandy was unable to continued giving the Plaintiff money for his litigation expenses, fail to demonstrate the existence of a genuine dispute of material fact regarding retaliation. [See Doc. 1: Compl. at 32]; Adams, 40 F.3d at 74.

The Plaintiff he has failed to forecast evidence that his exercise of his First Amendment rights was a substantial motivating factor in any adverse action against him; therefore, the Defendants will be granted summary judgment on Plaintiff's retaliation claims.

### d. Disciplinary Due Process

"[C]onstitutional procedural due process protections extend to prison disciplinary proceedings that could adversely impact an inmate's liberty interests – such as the loss of good time...." Lennear v. Wilson, 937 F.3d 257, 268 (4th Cir. 2019) (citing Wolff v. McDonnell, 418 U.S. 539, 555 (1974)). Under Wolff, an inmate charged with a disciplinary violation implicating a protected liberty interest must receive, at a minimum: advance written notice of the a claimed violation; an opportunity to call witnesses and present documentary evidence; and a written statement of the evidence relied upon by the factfinder and the reasons for the disciplinary action taken. Henderson v. Harmon, 102 F4th 242, 248 (4th Cir. 2024) (citing Wolff, 418 U.S. at 539, 556); see also Lennear, 937 F.3d at 269 (holding that "prison video surveillance evidence constitutes documentary evidence subject to the procedural due process protections recognized in

Wolff"). Procedural errors in prison proceedings are subject to harmless error review under which "courts must determine whether the excluded evidence could have aided the inmate's defense." Lennear, 937 F.3d at 277.

The Plaintiff alleges that Defendant Moss violated due process by failing to provide the DHO with handheld camera video for the April 20, 2020 disciplinary infractions. [Doc. 54: Second Am. Compl. at 23-24]. The forecast of evidence demonstrates that the Plaintiff lost no good time for the infractions. [Doc. 106: MSJ Ex at 57, 72]; Lennear, 937 F.3d at 268. The forecast of evidence demonstrates that the Plaintiff received sanctions including 50 days in segregation and the suspension of privileges; however, he has not forecast any evidence that those sanctions imposed an "atypical and significant hardship … in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). Absent the loss of good time or evidence of an atypical and significant hardship, there is no forecast of evidence implicating Plaintiff's liberty interests and the disciplinary due process claim fails.[20]

Assuming *arguendo* that the Plaintiff had forecast evidence implicating a liberty interest, he has still failed to demonstrate the existence of a genuine dispute of material fact for trial. The forecast of evidence shows that many of the April 20 incidents occurred before the handheld video began recording. [See Doc. 105-5: Brown Decl. at ¶¶ 6-9]. Moreover, the handheld camera footage depicts the Plaintiff using profane language, admitting that he refused Poteat's orders, and engaging in aggressive behavior. [See Doc. 105-1 (Exhibit J)]. To the extent that the footage captured the relevant events, it would not have aided Plaintiff's defense and, to the contrary, it would have supported the disciplinary charges had it been provided to the DHO. The Court need

---

[20] Because there is no evidence implicating the Plaintiff's liberty interest, the Court declines to apply the abstention principles articulated in Heck v. Humphrey, 512 U.S. 477, 487 (1994) and Edwards v. Balisok, 520 U.S. 641 (1997). See Muhammad v. Close, 540 U.S. 749, 751-52 (2004) (noting that "Heck[] … is not … implicated by a prisoner's challenge that threatens no consequence for his conviction or the duration of his sentence").

not accept Plaintiff's conclusory statements that the video was favorable and would have "yielded a different outcome" because it is belied by the forecast of evidence. [Doc. 1: Compl. at 23, 35-36]; Scott, 550 U.S. at 380. Accordingly, the Defendants will be granted summary judgment on the Plaintiff's disciplinary due process claim.

### e. Supervisory Liability

The Plaintiff asserts that the supervisory Defendants failed to ensure that their subordinates adhered to prison policy and refrained from retaliating against him. [See Doc. 54: Second Am. Compl. at 17, 20, 32-33]. To establish liability under 42 U.S.C. § 1983, a plaintiff "must affirmatively show that the official charged acted personally in the deprivation of [his] rights." Williamson v. Stirling, 912 F.3d 154, 171 (4th Cir. 2018) (cleaned up); see Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977) (citation omitted). Mere knowledge of a deprivation is insufficient. Williamson, 912 F.3d at 171. As such, the doctrine of respondeat superior does not apply in actions brought under § 1983. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). While personal involvement is required, it need not be "hands-on." Riddick v. Barber, 109 F.4th 649 (4th Cir. 2024). "Instead, the 'requisite causal connection' between defendant and violation can be established if the defendant 'set[s] in motion a series of acts by others which the actor[ ] know[s] or reasonably should know would cause others to inflict the constitutional injury.'" Id. at 649-50 (citing Amisi v. Brooks, 93 F.4th 659, 670 (4th Cir. 2024) (establishing liability for a person who "subjects, or causes to be subjected," another person to a deprivation of constitutional rights) (internal quotation marks omitted)).

The Plaintiff's underlying § 1983 claims have not survived summary judgment. See Sections a-d, *supra*. Therefore, the Plaintiff's supervisory claims based on those incidents likewise fail. See Waybright v. Frederick Cnty., Md., 528 F.3d 199, 203 (4th Cir. 2008) ("supervisors ...

cannot be liable under § 1983 without some predicate 'constitutional injury at the hands of the individual [state] officer,' at least in suits for damages.") (quoting <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986)). The Defendants' Motion for Summary Judgment is, therefore, granted on Plaintiff's supervisory claims.

### f. Qualified immunity

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." <u>Henry v. Purnell,</u> 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the plaintiff has demonstrated that the officer violated a constitutional right and (2) whether that right was clearly established at the time of the alleged violation." <u>E.W. ex rel. T.W. v. Dolgos</u>, 884 F.3d 172, 178 (4th Cir. 2018) (internal quotation marks omitted). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." <u>Smith v. Ray</u>, 781 F.3d 95, 100 (4th Cir. 2015) (internal quotation marks omitted).

The Plaintiff has not presented a forecast of evidence that any Defendant violated his constitutional rights, thus, the Defendants are entitled to qualified immunity on the Plaintiff's § 1983 claims. As such, summary judgment for the Defendants would also be proper on this ground.

### B. Supplemental Jurisdiction

The Court exercised supplemental jurisdiction over the Plaintiff's North Carolina negligence and constitutional claims that were based on the same conduct as the § 1983 claims that passed initial review. [<u>See</u> Doc. 53: Order on Initial Review; Doc. 54: Second Am. Compl.].

### a. NC Const. Art. 1, Section 19

The North Carolina Constitution's "law of the land" clause is "synonymous with the fourteenth amendment due process clause of the federal Constitution." McNeill v. Harnett Cty., 327 N.C. 552, 563, 398 S.E.2d 475, 481 (N.C. 1990). The Plaintiff's § 1983 due process claim has been dismissed, and the Plaintiff's Section 19 claim shares the same fate. See, e.g., Carmona v. Union Cnty. Sheriff's Offc., 3:21-cv-366-MR, 2023 WL 5674128 (W.D.N.C. Sept. 1, 2023). The Defendants will, therefore, be granted summary judgment on the Plaintiff's Section 19 claim.

### b. Negligence

A North Carolina negligence claim requires proof of: (1) a legal duty owed by the defendant to the plaintiff; (2) a breach of that legal duty; and (3) injury proximately caused by the breach. Keith v. Health-Pro Home Care Svc., Inc., 873 N.C. 442, 450, 873 S.E.2d 567, 574 (2022); Stein v. Asheville City Bd. of Educ., 360 N.C. 321, 328, 626 S.E.2d 263, 267 (2006). Claims of negligent supervision and training are "grounded in active negligence by the employer." Nance v. Rowan-Salisbury Bd. of Ed., 336 F.Supp.3d 593, 597 (M.D.N.C. 2018) (quoting Davis v. Matroo, 2013 WL 5309662, at *5 (E.D.N.C. Sept., 19, 2013); Braswell v. Braswell, 330 N.C. 363, 410 S.E.2d 897 (1991). A claim for negligent hiring or supervision requires proof: (1) that the specific negligent act on which the action is founded; (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; (3) either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in oversight and supervision; and (4) that the injury complained of resulted from the incompetency proved. Medlin v. Bass, 327 N.C. 587, 590–91 (1990).

The Plaintiff alleges that the Defendants' due process violation and retaliatory acts were negligent, and that the supervisory Defendants negligently allowed their subordinates to violate

the Plaintiff's rights. [Doc. 54: Second Am. Compl. at 5, 23-26, 32-36].

The Plaintiff's claims against the Defendants in their official capacities for negligence are claims against the State. See Section A(a), *supra*. North Carolina's Tort Claims Act ("TCA") provides a limited waiver of sovereign immunity for negligence claims asserted against the State and its departments and agencies. See N.C. Gen. Stat. § 143-291(a). The TCA vests exclusive jurisdiction to hear those claims in the North Carolina Industrial Commission ("NCIC"). N.C. Gen. Stat. § 143-291(e); Guthrie v. N.C. State Ports Auth., 307 N.C. 522, 526, 299 S.E.2d 618, 626 (1983). However, that limited waiver "does not extend to [suits] in federal court." Southeastern Public Safety Group, Inc. v. Munn, 2024 WL 4625079 (4th Cir. Oct. 2024) (citing Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241 (1985) ("[I]n order for a state statute … to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in *federal court.*")); see Stewart v. North Carolina, 393 F.3d 484, 490 (4th Cir. 2005) (noting that, "[a]s to claims sounding in negligence, North Carolina has vested exclusive jurisdiction in the [NCIC]" pursuant to § 143-291(a)). The Plaintiff's negligence claims asserted against the Defendants in their official capacities will, therefore, be dismissed without prejudice. See Laber v. Harvey, 438 F.3d 404, 414 n.5 (4th Cir. 2006) ("[I]f the district court believe[s] that it lack[s] subject-matter jurisdiction … the proper course [is] to dismiss the claim instead of granting summary judgment on it."); Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 185 (4th Cir. 2013) ("A dismissal for … any … defect in subject matter jurisdiction – must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits"); Fed. R. Civ. P. 41(b).

To the extent that the Plaintiff asserts negligence claims against the Defendants individually, these claims are barred by public official immunity. Under North Carolina law, "[t]he

public immunity doctrine protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties." Campbell v. Anderson, 156 N.C. App. 371, 376, 576 S.E.2d 726, 730 (2003). "A public official can only be held individually liable for damages when the conduct complained of is malicious, corrupt, or outside the scope of official authority." Hunter v. Transylvania Cty. Dep't of Soc. Servs., 207 N.C. App. 735, 737, 701 S.E.2d 344, 346 (2010); see Shaw v. Stroud, 13 F.3d 791, 803 (4th Cir. 1994). A public official acts "with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Grad v. Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888, 890 (1984); see Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir. 2003). "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." Grad, 312 N.C. at 313, 321 S.E.2d at 890-91. Here, the Plaintiff has failed to present a forecast of evidence that any Defendant acted maliciously, corruptly, or outside the scope of his official authority. See Sections III, IV(A), *supra*. The Plaintiff's conclusory allegations in this regard are insufficient.[21] See Bishop v. County of Macon, 620 F.App'x 148, 150 (4th Cir. 2015) ("mere allegations of gross negligence cannot defeat immunity"); Campbell v. Anderson, 156 N.C.App. 371, 576 S.E.2d 726 (2003) (summary judgment is appropriate where "[t]he record is devoid of any evidence showing maliciousness or corruption by the defendant"). The Defendants will, therefore, be granted summary judgment on the Plaintiff's negligence claims asserted against them in their individual capacities.

### C. Motion to Seal

There is a "presumption under applicable common law and the First Amendment that

---

[21] Even if public official immunity did not apply, the Defendants would be granted summary judgment because the Plaintiff has failed to forecast evidence that he suffered an injury that was proximately caused by any Defendant's breach of a legal duty that was owed to him. See Section A, *supra*.

materials filed in this Court will be filed unsealed." LCvR 6.1(a); see Rushford v. New Yorker Magazine, Inc., 846 F.2d 249, 253 (4th Cir. 1988) (First Amendment right to access to court proceedings includes criminal and civil cases). However, a court has authority to seal documents before it based upon the court's inherent supervisory authority over its own files and records. See Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 598 (1978). The denial of access to documents under the First Amendment must be necessitated by a compelling government interest that is narrowly tailored to serve that interest. See In re Washington Post Co., 807 F.2d 383, 390 (4th Cir. 1986); In re State-Record Co., Inc., 917 F.2d 124, 127 (4th Cir. 1990). Before sealing judicial records, a court must identify the interest that overrides the public's right to an open court, and articulate supporting findings specific enough that a reviewing court can determine whether the order was properly entered. See Press–Enterprise Co. v. Superior Ct. of Ca., 464 U.S. 501, 510 (1984); LCvR 6.1. When addressing motions to seal, the Court must consider alternatives to sealing and specify whether the sealing is temporary or permanent, and also may redact such orders in its discretion. LCvR 6.1.

The Defendants argue that their summary judgment materials include numerous exhibits that contain confidential information. [Doc. 107: Motion to Seal; see Doc. 52: Protective Order]. These exhibits include: NCDPS grievance records (Exhibits O through AJ); prison movement and control records (Exhibits C, D); confidential investigation materials (Exhibit K); and prison disciplinary records (Exhibits B, E, G, H, I, L). [Doc. 106 at 15-41, 46-106, 141-261]. The Defendants have filed a public version of the summary judgment exhibits that omits the confidential documents. [Doc. 105-1].

The Court has considered alternatives to sealing and finds that the NCDAC's interests in the confidentiality of certain prison records overrides the public's right to an open court in this

case, that there is no alternative that will adequately protect these concerns, and that permanently sealing the unredacted version of the Exhibit at issue is warranted. The Motion will be granted for the reasons set forth in the Motion and the Clerk of Court will be directed to permanently seal Docket Entry 106.

## IV. CONCLUSION

For the reasons stated herein, the Defendants' Motion for Summary Judgment is granted and this action is dismissed with prejudice except for the Plaintiff's official-capacity negligence claims, which are dismissed without prejudice. The Defendants' Motion to Seal is granted.

## <u>ORDER</u>

**IT IS, THEREFORE, ORDERED** that:

1. The Defendants' Motion for Summary Judgment [Doc. 104] is **GRANTED** as stated in this Order.

2. The Plaintiff's claims are **DISMISSED WITH PREJUDICE** except the official-capacity negligence claims which are **DISMISSED WITHOUT PREJUDICE**.

3. The Defendants' Motion to Seal [Doc. 107] is **GRANTED**.

4. The Clerk is respectfully instructed to permanently **SEAL** Docket Entry 106.

**IT IS SO ORDERED.**

Signed: December 23, 2024

Kenneth D. Bell
United States District Judge

27